FRANCES G. BRIGHAM, petitioner.

Suffolk.    March 23, 26, 1900. — May 18, 1900.

Present: HOLMES, C. J., KNOWLTON, MORTON, BARKER, & LORING, JJ.

*Petition to set aside a Decree of Divorce after Death of the other Party —
Laches — Lack of Due Diligence.*

Assuming that a petition to set aside a decree of divorce for adultery of the peti-
tioner, brought against the executor of the petitioner's husband, ever could be
maintained on the ground of the suppression of evidence by the fraud and collu-
sion of the husband with the petitioner, if her collusion is caused by duress,
threats, violence, and pecuniary temptation, her unreasonable delay in bringing
the petition puts an end to her rights.

PETITION, to set aside a decree of divorce for adultery of the
petitioner, brought against the executors of the will of the peti-
tioner's husband, Robert B. Brigham, and his next of kin and
sole heirs at law.   The executors demurred to the petition, as-
signing, among other grounds therefor, laches and lack of due
diligence in bringing the petition.   Hearing before *Hammond*, J.,
who reserved the case upon the demurrer for the consideration
of the full court.   The facts appear in the opinion.

*L. S. Dabney,* (*H. M. Burton* with him,) for the executors and
next of kin of Robert B. Brigham.

*G. Putnam & C. A. Snow,* (*W. W. Gooch* with them,) for the
petitioner.

HOLMES, C. J.   The petition in this case was reserved for
our consideration upon the executors' demurrer.   The petition
is very long and contains much irrelevant matter.   The more im-
portant allegations are as follows.   The libel against the peti-
tioner was filed on March 2, 1885.   It was served upon her in her
husband's house, where she was living, and thereupon she left him
and fixed her residence in New York.   In April she answered
and filed a cross-libel.   If the facts had been brought before
the court, the petitioner, irrespective of the truth of the charge
against her, which she denies, would have been able to prove
extreme cruelty and connivance.   Up to November 19, 1885,
she intended to fight.   But her husband played upon the fears

of one Bates, who was the plaintiff's confidential adviser, and who was said by the husband to have committed adultery with her, and played also upon the plaintiff's fears for her support, with such effect, that she was induced by her husband and Bates to agree to take $10,000, and to agree, upon that consideration, to allow him to get his divorce. Pursuant to this scheme she signed some agreements and instructed her counsel not to appear in the divorce suit, and a check for $10,000 was put in escrow to be delivered to her upon the passing of the decree. By an amendment it is alleged that her signatures were procured by force and violence exercised by Bates acting in collusion with her husband, and that her consent throughout was procured by " duress, violence and threats practised upon her by " Bates acting in the same collusion.

This amendment was filed only six days after the petition, and does not purport to override the previous allegations. It leaves the petitioner's collusion a voluntary act, upon motives. See *Fairbanks* v. *Snow*, 145 Mass. 153, 154. It merely adds to the motive of desire for the promised money and fear for her support, coupled with the efforts of Bates " to induce " the petitioner to assent, the further motive of duress on the part of Bates by threats and violence, — threats of what, and violence of what kind is not stated, but it must be assumed of a kind consistent with persuasion.

On May 20, 1886, the petitioner was defaulted in the divorce suit, and depositions were laid before the judge, who entered a decree *nisi* on May 22. On November 20, 1886, the petitioner was so far free from any undue influence that she filed petitions in the divorce suit setting up her collusion, reaffirming her answer and cross-libel, and asking that the decree *nisi* and the dismissal of her cross-libel be set aside. She remained free until November 1, 1888, but did nothing further. At that time, her husband having repudiated the ten thousand dollar arrangement and having got back the check, she was in distress for money. Bates, frightened by a threat on the part of her husband to publish the evidence against the petitioner and him, and colluding with her husband, advised and induced her not to proceed with her petitions. At the same time her husband added threats of an indictment for perjury if she should deny

the charge of adultery in testimony, and offered her $5,000 if she would consent to the decree being made absolute, which consent, it is said, was obtained through the duress and undue influence of Bates colluding as aforesaid. This money she seems to have received, and under the influences stated she remained in New York and instructed her counsel not to appear at the trial of the case on November 7. By another part of the above mentioned amendment it is alleged that her signatures to some of the instructions were forged, and that her genuine signatures, if any, were compelled by the threats and duress already mentioned. At this point again it will be perceived that although the words "duress" and " undue influence" are used, the elements of pressure were all appeals to motives, and that the duress was not of so absolute a nature as to exclude the payment of money. So far as appears she knew Bates's motives for taking the part which he took in the affair.

The petitioner not appearing, her petitions were dismissed, and the decree *nisi* was made absolute — it is alleged, without a hearing, but according to the record of the earlier proceedings, which was laid before us by agreement, after a hearing on the petitions.

The conditions stated, which constituted the duress, or, as it is amended, a great part of the duress, under which she directed her counsel not to prosecute her petition, continued until the death of Bates at a time not stated, but, it appears, before, and, it would seem, a considerable time before, the death of her husband. Her husband died on January 2, 1900. The petitioner, being advised by counsel that on the facts she could claim the rights of a widow in her husband's estate, did nothing until he died, and then filed this petition. She alleges that while he lived his great wealth could be used to shut off evidence to prove her case, that premature action probably would have led to the destruction of evidence, and that since his death she for the first time became able to prove the allegations of this petition.

We have stated the substance of the petition because the statement seems to us enough to show that it ought not to be maintained. If such a petition can be maintained under any circumstances, obviously it must be scrutinized with the greatest

suspicion and jealousy to prevent opening a door to fraud. In this case, whatever sinister influences brought about the petitioner's consent to the decree *nisi*, she was free from them for two years, and brought them to the attention of the court on the record. Therefore they may be laid out of the case. Then for two years she neglected to take a step. Then, according to her account, she was bribed and frightened into a second default. But the court when it made the decree absolute had notice, and in every probability had actual knowledge, of her charge of collusion, now renewed. If the case stopped there, she has had her day in court, and it would be a strong thing to reopen matters which have been in issue and which she has had a chance to try. See *Gale* v. *Nickerson*, 144 Mass. 415, 419; *United States* v. *Throckmorton*, 98 U. S. 61.

But the case does not stop there. · By the death of Bates all the so called duress was removed. Then it was her business and duty to move at ¯once. Instead of that she waited, and it is implied, if not admitted, that she waited for the death of her husband.

It is very clear that divorce proceedings generally are ended by the death of a party. They are conspicuous examples of those personal actions which die with the person. To state the same result from a different point of view, in general, an executor does not represent his testator for the purposes of a matrimonial cause. *Stanhope* v. *Stanhope*, 11 P. D. 103, 106, 107, 109, 110. Whether there is an exception where it is sought to set aside a decree of divorce on the ground that it was obtained by the fraud of the deceased party, we have not found it necessary to consider, and we express no opinion. If there is such an exception, the further question remains whether, as seems to have been held in one or two American decisions, it extends beyond cases in which the fraud went to the jurisdiction of the court. This also we leave untouched.

Assuming the exception to exist, it would be carrying it a great way if it was extended to a case where the whole ground of the application to vacate the decree is the plaintiff's own collusion on the merits. The jurisdiction in this case was undoubted and complete. ` Of course collusion of the kind narrated does not make the decree void, as is sufficiently shown by

the present petition to set it aside. *Greene* v. *Greene*, 2 Gray, 361. *Thomas* v. *Beals*, 154 Mass. 51, 53. *Miltimore* v. *Miltimore*, 40 Penn. St. 151, 155. Action on the part of the court is necessary to annul the decree. Such action the court would not take of its own motion, so that the question necessarily arises as to the merits of the party who asks it to act. The question is whether the plaintiff can get a *locus standi* from her own fraud upon the court. It is very clear that she could not, unless the fact that her husband improperly created some or all of her motives for colluding with him makes a difference. *Greene* v. *Greene*, 2 Gray, 361, 362. *Edson* v. *Edson*, 108 Mass. 590, 598. *Miltimore* v. *Miltimore*, 40 Penn. St. 151, 156. *Nichols* v. *Nichols*, 10 C. E. Green, 60, 65. *Kinnier* v. *Kinnier*, 45 N. Y. 535, 542. *Simons* v. *Simons*, 47 Mich. 253.

Whether the part alleged to have been played by the husband does make a difference is another question that we shall not decide. Clearly it would not be enough to allege that her husband offered her money and she took it. It would not be enough to allege that her husband used pressure to induce her friend and adviser to advise her to take money and settle. We leave it undecided whether the word "duress" turns the scale, when shown, as it is shown here by the context, not to mean absolute domination through well founded fear of violence, or through fear alone on any other ground. According to the petition the petitioner acted under a pressure produced by an appeal to her need for money (not created by the husband), to her fear of indictment for perjury if she testified to what she alleges to be the truth, to her or her friend Bates's fear of publicity, as well as by any fear of violence there may have been. The proportion of the different elements is left wholly indeterminate. *Miltimore* v. *Miltimore*, 40 Penn. St. 151, 156. It hardly would be too much to say that her want of money may have been the chief motive for her consent.

The counsel for the petitioner do not put her case as one of duress by violence or threats of violence. They recognize it as one of mixed motives in which money played a part, and in which the fear was mainly fear of scandal and of being indicted for telling the truth. But they say that the conduct of the parties was collusion none the less, and when brought to the

attention of the court would have prevented a decree, *Church-ward* v. *Churchward*, [1895] Prob. 7, and ought to vacate one. We may assume that if it. had been proved when it ought to have been, by a person competent to prove it, it would have prevented a decree; but it would seem that in England it would not have prevented a new proceeding, (ibid. p. 32,) so that the position now is different in a very important respect. Furthermore, the question of the petitioner's standing is untouched by the English cases.

We repeat that if in any case such a proceeding as the present is possible, the utmost diligence and good faith are the conditions, without which it cannot be entertained. If there were degrees in the requirement, it would be peculiarly exigent in a case presenting so many suspicious elements as this. But the petitioner, relying on getting the advantages of a widow without any of the troubles which she found incident to being a wife, and thinking that she would be better able to prove her case if the opposition of her husband was removed, waited until his death before she took a step. Whether it be called laches or be given a harsher name, such a course put an end to any claim she ever may have had to be heard. *Hubbard* v. *Hubbard*, 19 Col. 13. *Singer* v. *Singer*, 41 Barb. 139. *Nichols* v. *Nichols*, 10 C. E. Green, 60, 65. *Nicholson* v. *Nicholson*, 113 Ind. 131, 136. *Shaw* v. *Gould*, L. R. 3 H. L. 55, 87, 88. *Campau* v. *Van Dyke*, 15 Mich. 371. *Holbrook* v. *Holbrook*, 114 Mass. 568. *Evans* v. *Bacon*, 99 Mass. 213.

*Demurrer sustained.*