## 17526

Ruth Dillard JANNINO, Respondent, v. Lois Williams JANNINO, Individually and as Administratrix of the Estate of James C. Jannino, deceased, Jimmie Ruth Jannino and Toni Maria Jannino, Mrs. Mollie J. Caissey, Joseph Jannino and John Jannino, Appellants.

(108 S. E. (2d) 572)

*Messrs. Harry L. Hingson, E. P. Riley* and *Jack L. Bloom,* all of Greenville, *for Appellants,*

*Messrs. Leatherwood, Walker, Todd & Mann, W. E. Bowen* and *Frank Simpson,* all of Greenville, *for Respondent,*

April 29, 1959.

PER CURIAM.

The Court is called upon in this case to determine the heirs of James C. Jannino who died intestate on September 20, 1951. Lois Jannino, claiming to be his widow, applied for Letters of Administration on September 25, 1951. On October 12, 1951 she was appointed administratrix by the Probate Court of Greenville County, duly qualified and is now acting in that capacity. In November, 1954, Ruth Jannino brought this action in the Court of Common Pleas for Greenville County seeking an adjudication that she was the lawful widow of James C. Jannino and entitled to one-half of the estate. She alleged that a sister, Mrs. Mollie J. Caissey, and two brothers of the intestate, Joseph Jannino and John Jannino, were entitled to the remaining one-half. Lois Jannino duly filed an answer alleging that she was the lawful widow of the intestate and that she and her two minor children, Jimmie Ruth Jannino and Toni Maria Jannino, constituted the sole heirs at law. A similar answer was filed by the guardians *ad litem* of the two minors. The sister and brothers of the intestate, the remaining defendants, renounced any interest in the estate in favor of their co-defendants, whom they alleged to be the only lawful heirs of the intestate.

The case was referred to the Master for Greenville County who, after taking considerable testimony, found (1) that James C. Jannino was lawfully divorced from Ruth Jannino on April 5, 1948, (2) that Ruth Jannino was estopped from claiming any interest in the estate because of certain separation and property settlement agreements entered into between her and her husband, and (3) that she was barred by laches from challenging the validity of the divorce decree. He, therefore, concluded that Ruth Jannino had no interest in the estate and that Lois Jannino and her two minor children constituted the sole heirs at law. The Circuit Judge reversed this report. He held that the divorce was invalid; that there was no testimony justifying a finding of estoppel

or laches; and that Ruth Jannino was the lawful widow of the intestate and entitled to one-half of the estate. From this order Lois Jannino and her two children appealed. During the pendency of the appeal in this Court, Toni Maria Jannino died.

Although both women now claiming to be the wife of Jannino at the time of his death have remarried, for clarity we shall continue to refer to respondent, the first wife, as Ruth Jannino and to the second wife as Lois Jannino or Lois Williams, her maiden name.

Jannino was generally known as H. E. (Happy) Goodman. He was 54 years of age at the time of his death. He and Ruth Jannino were married in South Carolina in 1925. No children were born of this union. After living in several different States they came to Greenville, South Carolina, in 1931. A few years later they built and operated a restaurant on the outskirts of Greenville known as "The Pines". Their marital life appears to have been harmonious until about 1940 or 1941 when respondent says that she learned that her husband had become enamored of Lois Williams then a young girl employed at the Pines. About this time Lois Williams became pregnant by Jannino. However, she induced respondent's brother, David Dillard, who was then in the Service, to believe that he was the prospective father and they were married in 1941. Shortly thereafter the child, appellant Jimmie Ruth, was born. After the marriage David Dillard was sent overseas for a period of three years. He returned in June, 1945. His marriage to Lois Williams was dissolved by a Georgia divorce procured by her in September, 1945.

About the time Lois Williams became pregnant, respondent left Jannino and obtained employment in Greenwood, South Carolina. During this separation the restaurant on the outskirts of Greenville was destroyed by fire. A year later there was a reconciliation. Respondent and Jannino then commenced operating a restaurant in the City of Greenville known as Pines Uptown. Intermittent quarrels and separa-

tions followed. On October 5, 1945 they entered into a separation agreement containing recitals and covenants usually found in such instruments, including a renunciation by each party of the right to inherit from the other. The consideration recited was the exchange of mutual promises and the payment of $2,500.00 by Jannino to respondent. She contends that a month later Jannino became financially pressed and she returned the $2,500.00 to him. On March 25, 1946, they entered into a separation agreement in which it was stated that they were "desirous of affirming" the agreement made on October 5th. In this instrument a note and mortgage were assigned to respondent and she also acknowledged receipt of $1,000.00. She testified that the $1,000.00 was given in reimbursement of funds previously advanced by her to her husband. She claims that the separation agreements were disregarded and that she and her husband continued cohabitation.

In January, 1948, Jannino brought an action for divorce against respondent in Transylvania County, North Carolina, which was granted on April 5, 1948. On August 31, 1948, Jannino and Lois Williams were married in Pickens County, South Carolina. They lived together as man and wife until he was killed in an automobile accident on September 20, 1951. To this union there was born Toni Maria Jannino. It seems to be conceded that this child was conceived prior to the marriage.

In 1952 Lois Jannino brought an action in the County Court of Greenville County for the purpose of legitimatizing Jimmie Ruth Dillard, which resulted in a decree adjudging her to be the legitimate daughter of Lois and James Jannino with the full right of inheritance and directing that her name be changed from Jimmie Ruth Dillard to Jimmie Ruth Jannino.

One of the hotly contested issues is whether Jannino was a resident of North Carolina for a period of six months prior to the institution of the divorce action, as required by the laws of that State. Respondent offered testimony to

the effect that during this period Jannino often visited her home in Greenville, staying as long as several weeks at a time; that quite frequently he was seen in and around Greenville at social functions and attending to various business transactions, including the rebuilding of the restaurant which had been destroyed by fire; that he kept a safety deposit box and an active account at a Greenville bank; that the Greenville city directories carried a Greenville address; and that he operated a restaurant during the summers of 1946 and 1947 at Myrtle Beach. Appellants offered no testimony on this issue. The Master, after stating that "the attitude and demeanor of most of the plaintiff's witnesses were such as to leave me unable to accept their testimony with much credibility or probative value", found as a fact that the respondent had failed to establish by satisfactory evidence that Jannino was not a resident of North Carolina during the six months period preceding the institution of the divorce proceedings. The Circuit Judge, while conceding that the testimony did "not exclude every possibility that Jannino had a place of abode in North Carolina for six months prior to January 5, 1948", said he had no hesitancy in concluding that he did not establish such residence.

The undisputed testimony shows that respondent knew Jannino was going to bring an action for divorce and thereafter marry Lois Williams unless she changed her "attitude". She testified: "He called me the night before they were to be married and asked if I had changed my attitude about he and I trying to make a go of it". After this marriage respondent occasionally visited Jannino's restaurant. She made no effort to question the divorce while Jannino was living. In 1952, a year after his death, she filed a claim against the estate in the sum of $925.00. No question was ever raised about the validity of the divorce until this action was instituted in 1954. Her only excuse for failure to raise the question earlier is that she thought the divorce was a legal one.

We find it unnecessary to pass upon the validity of the North Carolina divorce for we think respondent is barred by laches from attacking it.

"It is not questioned, nor can it be, that a party against whom a void decree of divorce is granted may be barred by laches or estoppel from attacking it." *Swift v. Swift,* 239 Iowa 62, 29 N. W. (2d) 535, 539. This does not mean that a void judgment of divorce can be legalized by the acts of the divorced parties or that they can become divorced by estoppel. We are not called upon in this controversy to reinstate a marriage. This action is one relating solely to property rights. The marriage between respondent and Jannino, with all its duties and obligations, has been terminated by his death. She is now asserting the former relation and the invalidity of the decree of divorce solely for the purpose of obtaining his property. Under these circumstances the doctrines of laches and estoppel can be considered. In *McElrath v. Littell,* 120 Minn. 380, 139 N. W. 708, 710; 44 L. R. A., N. S., 505, the Court said:

"The welfare of the nation depends in a great measure on the stability and permanency of the marriage relation. We also grant that upon an application to vacate a decree of divorce, because wrongfully obtained, where such vacation results in reinstating the marriage, the court should be equally solicitous in promoting the interest of the state. But where the court is not invited to act until the marriage in question is irrevocably dissolved by a power beyond the control of any court of justice, we have a different situation. Such is the present case,—a mere property controversy, based on the existence or nonexistence of a valid divorce decree. Therefore the equitable principles which ordinarily rule property rights should be applied."

In *Grant v. Grant,* 233 S. C. 433, 105 S. E. (2d) 523, 526, the following was quoted with approval: "The safety of society demands that one who seeks to overthrow an apparently valid decree of divorce should proceed with the

utmost promptness upon discovery of facts claimed to show its invalidity."

It is quite obvious in the instant case that respondent did not care to resume the duties and obligations of a wife for, with full knowledge of the facts which she now claims invalidate the divorce, she took no steps to set it aside until after the lips of Jannino had been closed by death. Even then she made no claim as an heir or widow but filed a claim as a common creditor. After Lois Jannino had been administering on the estate for a period of approximately three years, respondent for some unexplained reason suddenly decided to assert the right of a widow and claim half of the estate. The Master concluded that her action at this late date was prompted by the fact that the value of the small estate had been considerably increased by capable management of the administratrix and by enhancement in the value of the property. The Circuit Judge said that there was no testimony sustaining such a statement. Be that as it may, respondent's non-action for so long a period of time is not satisfactorily accounted for. There has been a loss of material evidence. Respondent has sought to establish by testimony, most of which the Master said was of "dubious credibility", that Jannino never resided in North Carolina. With his death, appellants were in a difficult position to answer this charge. Respondent claims that the separation agreements were abrogated by cohabitation between the parties and that she refunded all monies paid to her under these agreements. With Jannino dead, appellants were hardly in a position to offer any testimony to the contrary.

Suppose after the divorce respondent had predeceased Jannino, certainly he would not have been in a position to claim as an heir of her estate. She let the decree serve as a protection to her heirs if she should die first owning property. If Jannino had known respondent intended to contest the validity of the divorce, would he have died intestate? These are considerations to be weighed in determining the equities involved.

In *Brigham v. Dillaway,* 176 Mass. 223, 57 N. E. 328, 330, the wife, after her husband's death, sought to set aside a decree of divorce on the ground that she was induced not to contest the action by reason of duress and fraud on the part of her husband. In denying relief, Chief Justice Holmes said:

"We repeat that, if in any case such a proceeding as the present is possible, the utmost diligence and good faith are the conditions without which it cannot be entertained. If there were degrees in the requirement, it would be peculiarly exigent in a case presenting so many suspicious elements as this. But the petitioner, relying on getting the advantages of a widow without any of the troubles which she found incident to being a wife, and thinking that she would be better able to prove her case if the opposition of her husband was removed, waited until his death before she took a step. Whether it be called laches or be given a harsher name, such a course put an end to any claim she ever may have had to be heard."

In *Zoellner v. Zoellner,* 46 Mich. 511, 9 N. W. 831, 832, the husband obtained a divorce in 1872, shortly thereafter remarried and died intestate in 1880. About a year later the wife filed a petition to set aside the divorce on the ground that the order of publication and the showing thereof were false and fraudulent and an imposition on the Court. In refusing to set aside the divorce, the Court said:

"Nothing is now involved except property. The sole motive of the petitioner in assailing the judicial proceeding which purported to sever her connection with the deceased complainant is to get through a kind of post mortem adjudication a share of the property he left. We think she was not disposed to attack the proceedings during his life-time, and when, if successful, the result would have been a revival of the state of marriage. But that she designedly abstained from moving, until, in consequence of his death, the property interest might be pursued without the risk of any restoration of conjugal connection. The claim set up by the peti-

tioner is therefore to be judged by the standard applicable to property questions. The decree in question is *prima facie* valid; and granting that it was obtained by the means asserted, still the facts are extrinsic and are only provable by outside evidence. The case is hence one where the adjudication must subsist and operate as valid until overthrown by a judgment pronounced against it upon appropriate evidence.

"Now the decree of divorce as we have noticed was given in September, 1872, at the city of Detroit. The petitioner was at her father's in Toledo, distant about two hours by railway, and she was very soon informed by complainant.

"The defects in the proceedings which are now set up were open to detection by the least attention to facts which must have been obvious to her, and the notice from her husband and the surrounding circumstances with which she was intimate were urgent calls upon her to look into the proceedings. In short if her present explanations are correct the facts of which she had full knowledge implied conclusively that the decree was a fraud, and there is no reason to suppose that she was not then as eligibly situated to take action as she is now. And although she continued in the same near neighborhood, she yet waited from the fall of 1872 until the thirty-first of March, 1881, an interval of between eight and nine years, and including in it the period of more than seven and a half years whilst complainant was living and the space of nearly a year subsequent to his death. And the case is bare of circumstances to palliate the delay."

The controversy in *Harris v. Harris,* 90 U. S. App. D. C. 239, 196 F. (2d) 46, 47, *certiorari* denied 344 U. S. 829, 73 S. Ct. 34, 97 L. Ed. 645, was as to who was the lawful widow of a decedent. The first wife was divorced by a decree of a Virginia Court in 1935. Her husband remarried in 1936 and died in 1948. Although the first wife knew of the divorce, she took no steps to attack it until the estate was being administered. She then asserted its invalidity upon the ground that the decedent had not been a resident of

Virginia for the requisite period prior to instituting the divorce proceedings. In upholding a plea of laches the Court said:

"The facts justified the court's conclusion with respect to laches. The intervening death of decedent made it more difficult for appellee to defend the Virginia proceedings insofar as their validity turned upon the critical facts regarding decedent's residence or domicile. Further, decedent's will evidenced an understanding on his part that appellee would be provided for as his widow. Otherwise he might well have made other provision for her. These factors, coupled with the long lapse of time, are adequate support for the decision."

In *Magistro v. Magistro,* 182 Pa. Super. 487, 127 A.. (2d) 758, 760, the husband procured a divorce in Pennsylvania in 1947 and died in 1954. In 1955 his wife sought to open and set aside the decree alleging that at the time the divorce proceedings were instituted her husband had not been a *bona fide* resident of Pennsylvania for a period of one year as required by law. In refusing to open the judgment, the Court noted that she did not question the truthfulness of her husband's sworn testimony concerning his residence until he was dead and unable to testify, and witnesses who may have been known to him but not known to his executor could not be obtained.

In distinguishing an earlier case (cited by the court below in the instant case), the Court said:

"Although we held in *Loiacono v. Loiacono,* 1955, 179 Pa. Super. 387, 116 A. (2d) 881 that the doctrine of laches was not applicable to a delay in questioning the jurisdiction of a Nevada court to enter a decree of divorce, and we there cited a number of cases where the courts refused to apply the doctrine of laches to petitions to open divorce decrees granted in this state; nevertheless, when the defendant in a divorce case delays bringing an action to set aside the decree until after the death of the plaintiff years later, it is a matter which may be given serious consideration by the court in

determining whether, in the proper exercise of its equitable powers, it should open the decree."

Most of the cases cited in the circuit decree are distinguishable in that the attack on the divorce was made while the other spouse was living.

It is true that in *Peoples National Bank of Greenville v. Manos,* 226 S. C. 257, 84 S. E. (2d) 857, 870, 45 A. L. R. (2d) 10, 70, involving an action brought after the husband's death, we held invalid a divorce obtained by him from his first wife. But in that case the wife, who had been abandoned by her husband in Greece, had no knowledge of the divorce and his subsequent remarriage until years later. It is stated in the opinion that there was no evidence that she "had any notice of the divorce proceedings, or any opportunity to meet the charges upon which it was based, until the present action was brought." There was, therefore, no basis for application of laches.

The determination of the question of laches proceeds in the light of the circumstances of each case, taking into consideration among other things whether the delay has worked injury, prejudice or disadvantage to one of the parties. *Wallace v. Timmons,* 232 S. C. 311, 101 S. E. (2d) 844. It is impossible to lay down any inflexible rule. The Court is vested with a wide discretion. *Ham v. Flowers,* 214 S. C. 212, 51 S. E. (2d) 753, 7 A. L. R. (2d) 1124. We are convinced under the facts of the instant case that the doctrine of laches should be applied.

The order of the Circuit Judge is reversed and the case remanded for further proceedings in accordance with the views herein expressed.